UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                              :
ANTHONY QUINT DANIEL          :
                              :
v.                            :    CIV. NO. 3:13CV01546 (HBF)
                              :
CAROLYN W. COLVIN,            :
ACTING COMMISSIONER OF        :
SOCIAL SECURITY               :
                              :
```

**RECOMMENDED RULING ON CROSS MOTIONS**

Plaintiff Anthony Quint Daniel ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. § 401 et seq. Plaintiff has moved to reverse the Commissioner's decision or, in the alternative, to remand the case for a rehearing [doc. #17], while the Commissioner has moved to affirm [doc. #20].

For the reasons set forth below, plaintiff's Motion to Reverse Decision of the Commissioner and/or to Remand to the Commissioner [doc. #17] is DENIED. Defendant's Motion for Order Affirming the Decision of the Commissioner [doc. #20] is GRANTED.

## I.   ADMINISTRATIVE PROCEEDINGS

Plaintiff filed an application for DIB on February 18,

2010,[1] alleging disability beginning January 22, 2010. [Certified Transcript of the Record, Compiled on January 23, 2014 (hereinafter "Tr.") 96, 111, 183]. Plaintiff's date of last insured is June 30, 2010. [Tr. 95, 110]. His claim was initially denied on September 24, 2010 [tr. 95-109] and denied upon reconsideration on December 23, 2010 [tr. 110-21].

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). [Tr. 133-34]. On November 11, 2011, ALJ Kim Griswold held a prehearing conference at which plaintiff appeared. [Tr. 38-51]. During the prehearing conference, the ALJ explained to plaintiff his right to legal representation and how to ensure that all his medical records were included in his file. [Tr. 38-51]. On April 5, 2012, ALJ Griswold held a hearing at which plaintiff, represented by counsel, and vocational expert Warren Maxim testified. [Tr. 52-94]. On May 25, 2012, the ALJ issued an unfavorable decision in plaintiff's case. [Tr. 12-35]. The ALJ's decision was amended on July 27, 2012 to include the remainder of a paragraph that had been omitted from the original decision; the amendment did not alter the outcome of the decision. [Tr. 7-10].

On September 25, 2013, plaintiff's request for a review of

_____

[1] Both Disability Determination Transmittal sheets [tr. 95, 110], as well as the ALJ's decision [tr. 15] list February 18, 2010 as plaintiff's application date. However, the application contained in the record is dated March 11, 2010. [Tr. 183-86]. The discrepancy in dates is of no moment to this decision.

the ALJ's decision [Tr. 11] was denied, thereby making the ALJ's decision the final decision of the Commissioner. [Tr. 1-6]. Plaintiff, represented by counsel, timely filed this action for review of the Commissioner's decision.

## II.  ELIGIBILITY FOR BENEFITS

Under the Social Security Act, an individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible to receive disability insurance benefits under Title II of the Social Security Act, for which plaintiff applied, a claimant must demonstrate onset of disability on or before his date last insured. 42 U.S.C. §§ 423(a)(1)(A), (c)(1); see also Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (citing Arnone v. Brown, 882 F. 2d 34, 37 (2d Cir. 1989)).

The Social Security Administration ("SSA") has promulgated regulations prescribing a five step analysis for evaluating disability claims. If the Commissioner determines:

> (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively

3

requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); see also 20 C.F.R. §§ 404.1520(a); Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).

It is well established that plaintiff bears the burdens of production and persuasion through the fourth step, "but if the analysis proceeds to the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform given his residual functional capacity," which is determined at step four of the analysis. Gonzalez ex rel. Guzman v. Sec'y of United States Dep't of Health and Human Servs., 360 F. App'x 240, 243 (2d. Cir. 2010). "Residual functional capacity" ("RFC") is what a person is capable of doing despite his physical and mental limitations. See 20 C.F.R. § 404.1545(a). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment and the Commissioner fails to show that the claimant can perform alternate gainful employment. 20 C.F.R. § 404.1520(f); see also Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (citations omitted).

Additionally, if there is medical evidence of substance use

disorders, the ALJ must consider the impact of those disorders on a finding of disability. The Social Security Act states that "an individual shall not be considered disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The regulations require that an inquiry be made as to "whether [the Commissioner] would still find [the claimant] disabled if [he] stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1). If the "remaining limitations," considered independently of any drug or alcohol abuse, "would not be disabling, [the Commissioner] will find that [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability," and the claimant will be found to not be disabled. 20 C.F.R. § 404.1535(b)(2)(i). If the claimant would be disabled regardless of the drug or alcohol use, then it is not a contributing factor. 20 C.F.R. § 404.1535(b)(2)(ii). The burden is on the claimant to prove that substance abuse is not a contributing factor material to the disability determination. Cage v. Comm'r of Soc. Sec., 692 F. 3d 118, 123 (2d Cir. 2012).

### III. ALJ'S DECISION

Following the five step evaluation process, ALJ Griswold concluded that plaintiff was not disabled at any time from the

5

alleged onset date through the date of decision.[2] [Tr. 29]. At

step one, the ALJ found that plaintiff had not engaged in

substantial gainful activity since January 22, 2010, the alleged

onset date. [Tr. 17]. At step two, the ALJ found that plaintiff

suffered from the following severe impairments: depression,

antisocial personality disorder, anxiety disorder (post-

traumatic stress disorder), polysubstance dependence (involving

alcohol, heroin, and cocaine ongoing), and asymptomatic human

immunodeficiency virus (HIV)/acquired immune deficiency syndrome

(AIDS). [Tr. 17-18].  The ALJ noted that in addition to these

severe impairments, plaintiff had been diagnosed with chronic

kidney disease secondary to urinary retention, an enlarged

prostate, and lumbar L4-L5 spondylosis.[3] [Tr. 18]. She found

these three impairments to be "nonsevere as they result in

minimal, if any limitations in the claimant's ability to perform

work related activities when properly treated." [Tr. 17].

    At step three, the ALJ found that plaintiff's mental

impairments met listings 12.04 (affective disorders) and 12.09

(substance addiction disorders) of 20 C.F.R. Part 404, Subpart

---

[2] The ALJ also determined that plaintiff's date of last
insured was June 30, 2010, noting that plaintiff "must establish
a disability on or before that date in order to be entitled to a
period of disability and disability insurance benefits."
[Tr. 15].
   [3] The ALJ also noted that plaintiff was diagnosed with
diabetes in March, 2012, but found no medically determinable
evidence of this diagnosis prior to that date. [Tr. 17].

P, Appendix 1. [Tr. 14]. These listings are satisfied if a plaintiff has both (a) one or more medically documented persistent symptoms and (b) two or more marked restrictions, marked difficulties, or repeated episodes of decompensation; or if the plaintiff has (c) documentation of a chronic affective disorder lasting at least two years with certain noted limitations. 20 C.F.R. Part 404, Subpart P, App. 1. The ALJ found that plaintiff met criteria (a) and (b) because (a) he suffered from anhedonia, sleep disturbance, decreased energy, and feelings of guilt or worthlessness; and (b) he experienced marked difficulties in social functioning and with regard to concentration, persistence, or pace. [Tr. 19-20].

Because there was medical evidence of a substance use disorder, the ALJ next determined the materiality of drug and alcohol use on the disability determination. The ALJ found that if plaintiff stopped his substance abuse, his remaining limitations would not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [Tr. 21-22]. In making this determination, the ALJ considered listing 14.08 (HIV infection), but determined that plaintiff's HIV did not meet this listing because there was no documentation of bacterial infections, fungal infections, protozoan or helminthic infections, viral infections, malignant neoplasms, conditions of the skin or mucous membranes with extensive

7

lesions not responding to treatment, HIV encephalopathy, HIV wasting, diarrhea lasting for a month or longer resistant to treatment, or some other infection resistant to treatment. [Tr. 21]. The ALJ determined that if plaintiff ceased his substance abuse, he would no longer meet the criteria of listings 12.04 and 12.09 because he would have only moderate, rather than marked, difficulties in social functioning and with regard to concentration, persistence, or pace. [Tr. 22]. The ALJ considered evidence indicating that plaintiff's condition improved when he consistently received treatment and attended therapy and that plaintiff returned to church activities and improved his relationship with his wife when his alcohol dependence was in remission. [Tr. 22]. Although the ALJ determined that plaintiff's impairments, if he stopped his substance abuse, would not meet or equal a Listing, she also determined that his remaining limitations would result in a severe impairment or combination of impairments. [Tr. 10].[4]

As the ALJ did not conclude that plaintiff was per se disabled at step three, absent substance abuse, she proceeded to determine plaintiff's RFC and whether plaintiff could perform his past relevant work if he stopped his substance abuse. The ALJ determined that if plaintiff stopped his substance abuse, he

---

[4] This record page is from the ALJ's July 27, 2012 revised decision, which provided a portion of the ALJ's decision that was omitted from the May 25, 2012 decision. [Tr. 10].

would have the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b),[5] with the further limitation that plaintiff could occasionally stoop, crouch, crawl, kneel, balance, and climb ramps and stairs and could not climb ladders, ropes, or scaffolds. [Tr. 22]. The ALJ noted that plaintiff could understand, remember, and carry out simple to moderately complex instructions throughout an ordinary workday and workweek with normal breaks on a sustained basis and could tolerate occasional interaction with the general public, but could not tolerate strict rate, pace, or production requirements. [Tr. 22-23]. In reaching this conclusion, the ALJ conducted a two part analysis. [Tr. 23]. First, the ALJ determined whether there was an underlying, medically determinable, physical or mental impairment that could reasonably be expected to produce plaintiff's pain or other symptoms. [Tr. 23]. After the

---

[5] 20 C.F.R. 404.1567(b) states:

[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(footnote not included in original).

underlying impairment was established, the ALJ evaluated the
intensity, persistence, and limiting effects of the claimant's
symptoms to determine the extent to which such effects impaired
plaintiff's functioning. [Tr. 23]. The ALJ assessed the
credibility of plaintiff's allegations of disabling symptoms and
found that plaintiff's activities of daily living and the
medical evidence in the record were consistent with the RFC
assessment and inconsistent with the plaintiff's allegations of
disabling symptoms. [Tr. 23]. She found that although
plaintiff's medically determinable impairments could reasonably
be expected to produce his alleged symptoms, his statements
concerning the intensity, persistence, and limiting effects of
the symptoms were not entirely credible. [Tr. 25].

In making this credibility determination, the ALJ noted
that the medical evidence did not indicate "opportunistic
infections or weight loss, despite the claimant's allegations,"
and that his HIV appeared to be asymptomatic. [Tr. 25].
Regardless of this, she stated that she had accounted for his
alleged symptoms of fatigue by limiting him to a light
exertional level. [Tr. 25]. The ALJ further noted that
plaintiff's mental condition improved after receiving treatment
for a relapse, yet the RFC assessment still accounted for
plaintiff's alleged mental limitations. [Tr. 25]. The ALJ
considered medical records from the Connecticut State

Department, Saint Francis Hospital, InterCommunity Mental
Health, and the Institute of Living at Hartford Hospital;
various GAF scores rendered throughout plaintiff's treatment
history; and medical opinions from Dr. Harry Conte, therapist
Brian Cardona, consultative examiner Dr. Jesus Lago, and the
state agency consultants. [Tr. 23-27]. She gave great weight to
the opinions of treating physician Dr. Conte and consultative
examiner Dr. Lago, some weight to the opinions of the state
agency consultants, and little weight to the opinions of Mr.
Cardona, whose assessments she found to be inconsistent and
contrary to other evidence in the record. [Tr. 25-27]. She also
considered Exhibit 15E, a Medical Source Statement, allegedly
completed by plaintiff and his wife and reviewed and signed by
Mr. Cardona, as well as a letter regarding the exhibit that was
signed by Mr. Cardona. [Tr. 27-28]. The ALJ did not accept the
exhibit as a medical opinion and gave it very little weight.
[Tr. 28].

Regarding plaintiff's past relevant work as a stock person,
the ALJ found that job to be at the medium exertional level.
[Tr. 28]. Based on the testimony of vocational expert Dr. Maxim,
who testified that someone with plaintiff's RFC, age, and
background would be unable to perform this work, the ALJ found
that plaintiff was unable to perform his past relevant work.
[Tr. 28].

Finally, at step five, after considering plaintiff's age, education, work experience, RFC, and the vocational expert's testimony, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that plaintiff could perform if he stopped his substance abuse. [Tr. 28-29].

The ALJ concluded that the substance use disorder was a contributing factor material to the determination of disability because plaintiff would not be disabled if he stopped his substance abuse. She further concluded that plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of decision. [Tr. 29].

## IV.   SUBSTANTIVE EVIDENCE

### A.   HEARING TESTIMONY

Plaintiff, represented by Attorney Dennis Ciccarillo, and vocational expert Warren Maxim testified before ALJ Griswold at a hearing on April 5, 2012.[6] [Tr. 52-94].

### 1.   Plaintiff's Testimony

On the date of the hearing, plaintiff was 45 years old. [Tr. 61]. He stated he had not been able to work since January 2010, when he was diagnosed with HIV. [Tr. 62]. He testified that the diagnoses turned his life "upside down" and during that time period he regularly spent the day in bed doing nothing.

---

[6] The hearing was held in Hartford, Connecticut. [Tr. 52].

[Tr. 62, 77]. He stated that when he was diagnosed, he stopped eating, lost weight, could not pick up anything, could hardly pick himself up, and did not know what to do or how to handle anything in his life. [Tr. 62]. He stated that during this period, his wife brought him food and had to help wash him. [Tr. 80]. He testified that he experienced lower stomach and abdominal pain during this time, but did not do anything about it because he believed it was due to the HIV. [Tr. 78]. Plaintiff stated that his weight had dropped as low as 126 pounds at one point during 2010, but he was up to 200 pounds at the time of the hearing. [Tr. 62]. He said he was paranoid about his weight and now always wore extra clothing. [Tr. 62].

Regarding his daily activities, plaintiff testified that he lives with his wife, but does not help out around the house because his medications make him tired and he is always sleeping. [Tr. 64, 82]. He testified that his wife still has to help him wash sometimes. [Tr. 81]. He stated he sometimes goes out with her to stores and can walk for approximately 30 minutes before becoming dizzy and needing to sit down. [Tr. 81]. Overall, he stated that his strength is low. [Tr. 656]. Specifically, plaintiff testified he had difficulty washing dishes, standing up for long periods of time, and moving around. [Tr. 65]. He stated that he experiences pain in his prostate, arms, and abdomen; is short of breath; and suffers from

13

depression. [Tr. 65-66, 78]. Plaintiff stated he takes an inhaler for shortness of breath. [Tr. 71-72]. He stated that he uses a lotion on his hand because it sometimes "breaks out." [Tr. 72]. Plaintiff also testified that he takes painkillers and muscle relaxants for his abdominal pain, which helps somewhat, although he is still in pain. [Tr. 79].

Plaintiff stated he had been sober for a year as of the time of the hearing. [Tr. 63]. He stated he no longer experienced withdrawal symptoms from not drinking or using drugs and that those symptoms had resolved with psychiatric medication. [Tr. 69-70].  He testified that he was encouraged to remain sober through the treatment program at InterCommunity. [Tr. 63]. He also stated that he began going to church, talking to others about what was going on in his life, and receiving support to stop using alcohol and drugs. [Tr. 64]. Plaintiff testified that from 2009 through the time of the hearing he had seen Brian Cardona at InterCommunity for treatment of mental health issues. [Tr. 76].

At the time of the hearing, plaintiff testified that he had recently been in the hospital due to diabetes. [Tr. 64]. He also stated that he may undergo surgery for an enlarged prostate. [Tr. 64].

Regarding his past work, plaintiff testified he had worked as a stock person and in shipping and receiving at a department

14

store, had worked at a temporary placement agency doing construction work, had done security work, and had done machine work for a short period of time. [Tr. 87-88].

### 2. Vocational Expert's Testimony

Vocational expert Warren Maxim testified that plaintiff's past work experience as a stock person was coded as a "laborer, stores," which was medium work requiring training of up to one month. [Tr. 90]. The ALJ asked Dr. Maxim to consider a hypothetical individual of plaintiff's age, education, and work experience, with the residual functional capacity to lift and carry up to 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk for six hours in an eight-hour workday; occasionally stoop, crouch, crawl, kneel, balance, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; understand, remember, and carry out simple to moderately complex instructions throughout an ordinary workday and week with normal breaks on a sustained basis; occasionally interact with the general public; and never be required to perform tasks that require a strict rate, pace, or production. [Tr. 90-91]. Dr. Maxim testified that this person would be unable to perform plaintiff's past relevant work as a laborer due to the exertional level. [Tr. 91]. However, Dr. Maxim stated that such a person would be able to perform other jobs at the light and sedentary work levels such as cleaner, mail room clerk, and fast

15

food worker. [Tr. 91].

The ALJ then asked Dr. Maxim to consider the same hypothetical individual, except with the reduced exertional capacity of standing and walking for two hours in an eight-hour day, sitting up to six hours in an eight-hour day, and lifting and carrying up to ten pounds frequently. [Tr. 91]. Dr. Maxim testified that such an individual could perform jobs at the sedentary level such as escort vehicle driver and surveillance system monitor. [Tr. 92].

Dr. Maxim testified that such a hypothetical person would be unable to find work if he were absent once a week or was unable to work more than six hours a day. [Tr. 93].

Plaintiff's attorney declined to question the vocational expert. [Tr. 93].

## B.  CRIMINAL HISTORY

Plaintiff's file contains records of criminal proceedings indicating that plaintiff was found guilty of eight misdemeanor offenses and one unclassified offense between 2002 and 2010. [Tr. 278-87]. He was put on probation for the majority of the offenses and also served some jail time. [Tr. 278-87].

## C.  MEDICAL EVIDENCE

Plaintiff alleges he is disabled by both physical and mental impairments including HIV/AIDS and related symptoms, an enlarged prostate, anxiety disorder, depression, and substance

abuse. [Doc. #17-1 at 2].. He alleges that he has been unable to work since January 22, 2010. [Tr. 96]. A summary of the relevant medical evidence follows.

### 1. Activities of Daily Living Reports

Plaintiff completed an Activities of Daily Living Report on March 29, 2010. [Tr. 200-10]. Regarding his alleged disabilities, plaintiff stated he suffered from AIDS, which caused him to feel sick throughout his entire body, specifically in his head, legs, belly, brain, and eyes. [Tr. 200]. He stated he experienced symptoms every hour and that his activities were limited because he had to stop and rest. [Tr. 201]. He reported that he took medication which caused various side effects including nausea, diarrhea, loss of appetite, insomnia, drowsiness, forgetfulness, restlessness, dry eyes, headaches, and confusion.[7] [Tr. 202]. Regarding his daily activities, plaintiff stated he read, watched television, slept, talked with others, and fed pets with the help of his wife. [Tr. 203, 207-08]. He stated he could travel by walking, riding in a car, or using public transportation, but did not drive. [Tr. 206]. He was able to go shopping in stores, but did not state how often or where he shopped. [Tr. 207]. He reported that he regularly attended church groups and did not have problems getting along

---

[7] Plaintiff lists two other side effects of his medication, which cannot be discerned in the record copy. [Tr. 202].

with others. [Tr. 208]. He was not able to pay bills, but could count change, handle a savings account, and use a checkbook and he reported that his ability to handle money had not changed since the onset of his alleged disability. [Tr. 207]. He stated that prior to his alleged disabilities, he was able to work, clean the house, walk the dog, shop, cook, and take care of the yard. [Tr. 204]. Regarding changes in his daily activities, he reported that he was not able to rest because his sleep was broken up, had to sit to get dressed, was short of breath, and had to stay by the bathroom because of loose bowels. [Tr. 204]. He was able to prepare sandwiches and cereal, but could not cook a full meal due to lack of energy and shortness of breath. [Tr. 205]. He stated that he needed reminders to take care of personal hygiene and take medication. [Tr. 204]. He reported that his disability had affected  his ability to lift, walk, climb stairs, understand, see, remember, stand, complete tasks, and concentrate. [Tr. 208]. He stated he could only walk for a few minutes before resting, did not finish what he started, and could not handle stress or changes in routine. [Tr. 209]. However, he also reported that he could pay attention for "some hours" and that he followed written instructions well. [Tr. 209].

   2.   **Disability Reports**

   An undated Disability Report-Adult (Form SSA-3368) was

filed.[8] [Tr. 222-30]. Plaintiff stated he suffered from AIDS, kidney disease, and liver disease. [Tr. 223] He reported that he was taking Atripla, Azithromycin, and Fluconazole for AIDs; Atenolol for high blood pressure; Trazodone for pain; and Sertraline for unknown reasons.[9] [Tr. 227]. He stated he stopped working on January 22, 2010 "because of other reasons," and specifically "because of programs." [Tr. 224]. Although he stopped working for "other reasons," plaintiff stated his conditions caused him to make changes in his work activities and he believed his conditions became severe enough on January 22, 2010 to prevent him from working. [Tr. 224]. Plaintiff reported that he had completed the 12th grade and had attended special education classes. [Tr. 224].

Two undated Disability Reports-Appeal (Form SSA-3441) were also filed.[10] [Tr. 251-55, 258-64]. In both reports, plaintiff

---

[8] It appears that this report was filed on March 11, 2010. A Disability Report-Field Office (Form SSA-3367) dated March 11, 2010, was also filed; this report provides no additional relevant information. [Tr. 219-21]. Based on the organization of the record, it appears that the Field Office Report was filed at the same time as plaintiff's Disability Report. Additionally, a subsequent Disability Report-Appeal lists March 11, 2010 as the date of plaintiff's last Disability Report. [Tr. 251].

[9] Typically, Sertraline is used "to treat depression, panic attacks, obsessive compulsive disorder, post-traumatic stress disorder, social anxiety disorder." Sertraline, WEBMD, (August 22, 2014), http://www.webmd.com/drugs/2/drug-1-8095/sertraline-oral/sertraline-oral/details.

[10] It appears that the first Appeal Report was filed on or about December 18, 2010. A Disability Report-Field Office (Form SSA-3367) that appears, based on the organization of the record,

was asked if there had been any change in his condition. In the first report, plaintiff responded "no" and gave no further information. [Tr. 251]. In the second report, plaintiff stated he had been in "a lot of pain" since approximately February 2, 2011, and reported that he had been seeking, and continued to seek, medical treatment. [Tr. 258-60]. He stated that he was taking medications for his stomach, AIDS, anxiety, high blood pressure, high cholesterol, pain, and to help him sleep. [Tr. 261].

### 3.   Work History Reports

Plaintiff completed a Work History Report on March 29, 2010. [Tr. 211-18]. He listed the following past jobs: stockperson, everything, scan, deli, security, cook, stockperson, loader unloader, and loading unloading. [Tr. 211]. Plaintiff did not provide the dates worked at any previous job. In responding to questions, plaintiff stated that he used machines, tools, or equipment while working as a stockperson, scan, deli, and cook and used technical knowledge or skills while working as a stockperson. [Tr. 212-17]. He reported that these jobs required him to lift between 10 pounds and 50 pounds.

---

to accompany the first Appeal Report, was filed on December 18, 2010. [Tr. 249-50]. This Field Office Report provides no additional relevant information. Additionally, the second Appeal Report states that the previous report was filed on December 17, 2010. [Tr. 258]. The Field Office Report that appears to accompany the second Appeal Report is not dated. [Tr. 256-57].

[Tr. 212-17]. Plaintiff noted that he did the following
activities in these jobs: walking, standing, sitting, climbing,
scooping, kneeling, crouching, crawling, handling, reaching, and
writing/typing/handling small objects. [Tr. 212-17]. However,
plaintiff did not respond to a question requesting him to
identify how many hours of each workday he spent on these
activities. [Tr. 212-17]. Plaintiff reported that he supervised
15 people in his job as a stockperson, but also reported that
none of his time in this job was spent supervising people. [Tr.
212].

An undated Work History Report (Form SSA-3369) was
completed. [Tr. 231-46]. In the report, plaintiff lists four
jobs that he held in the 15 years prior to becoming unable to
work: loading, security, temporary work, and stock, with the
stock work being the most recent. [Tr. 231]. He stated he worked
the loading, temporary, and stock jobs for eight-hour days, five
days a week and the security job for ten-hour days, five days a
week. [Tr. 232-39]. Plaintiff provided no further information
about these jobs.

Plaintiff also provided an undated resume in response to a
work background questionnaire. [Tr. 265-67]. The resume lists
experience working as a laborer, building and grounds
maintenance worker, laundry laborer, material handler, kitchen
worker, tutor, clerk, security guard, laborer, and shipping and

receiving worker. [Tr. 266-67].

### 4.   Medical Questionnaires Completed by Plaintiff

Plaintiff completed an HIV questionnaire in August 2010.
[Tr. 247-48]. He reported that he was diagnosed with AIDS
because his T cell count was low and that he also had chronic
kidney disease, chronic liver disease, and high blood pressure.
[Tr. 247]. Plaintiff stated that his weight had dropped from 195
to 135 pounds and then from 170 to 163 pounds, but did not state
when this occurred. [Tr. 247]. Regarding the limitations on his
daily activities, plaintiff reported he was weak, stressed, in
pain, depressed, and scared and that he experienced problems
with his memory, weight, sex life, and energy level. [Tr. 248].
He noted that he did not believe his current doctor was helping
him and he was going to change doctors soon. [Tr. 248].

Plaintiff completed a medical treatment questionnaire in
February or March 2011.[11] [Tr. 268-70]. He reported that his T
cells were low and that he suffered from AIDS, depression,
kidney disease, and liver disease. [Tr. 268]. He reported that
he was participating in a pill box program to assist him in
taking medications. [Tr. 268]. He listed that he was taking 14
prescription and six non-prescription medications to manage his

---

[11] The date February 9, 2011 appears on the top of the first
page of the report under the abbreviation "DIWC." A second
medical treatment questionnaire states that the case was last
updated in March 2011. [Tr. 271].

22

conditions.  [Tr. 269-70]. He stated he had not been hospitalized since August 2010, which was listed on the questionnaire as the last time his case was updated. [Tr. 268].

Plaintiff completed a second, undated, medical treatment questionnaire. [Tr. 271-73]. He reported that his doctors had told him he suffered from AIDS, kidney disease, liver disease, and chronic pain. [Tr. 271]. He stated he was taking "lots of medication," but did not list them. [Tr. 273].

### 5.  Medical Records

#### a.  Saint Francis Hospital and Medical Center

Plaintiff was taken to Saint Francis Hospital and Medical Center on January 21, 2010, complaining of shortness of breath, pain while breathing, coughing up green and yellow fluid, and his right hand "locking up." [Tr. 321]. He was seen by Dr. Paula Cinti; she examined his breathing, heart, abdomen, bowel sounds, pulses, skin, extremities, muscle strength, facial expressions, and pupils and noted no abnormalities.  [Tr. 323-24]. Dr. Cinti diagnosed plaintiff with dehydration, shoulder pain, polysubstance abuse, and anemia. [Tr. 325]. She discharged him the same day and instructed him to follow up with the Urgent Medical Clinic. [Tr. 325].

On January 22, 2010, plaintiff visited the Saint Francis clinic. [Tr. 311]. Clinic records from this day indicate that plaintiff suffered from high blood pressure, polysubstance

abuse, Hepatitis B, and anxiety.[12] [Tr. 311]. Following the clinic visit, plaintiff went to the hospital and was seen by Dr. Joby Matthews. [Tr. 330]. Plaintiff reported that he had briefly lost consciousness. [Tr. 327]. He also stated he had a history of Hepatitis B, had been experiencing lower gastrointestinal bleeding, and had lost approximately 40 pounds since November of 2009. [Tr. 330]. Plaintiff reported he drank alcohol on January 20, 2010. [Tr. 330]. Labs were run and an examination was performed, which revealed nothing abnormal. [Tr. 327-30]. Plaintiff was released on January 22, 2010 with a diagnoses of syncope. [Tr. 333].

A January 28, 2010 report from Saint Francis Hospital, reviewing tests run during plaintiff's January 21 and 22, 2010 visits, reports that plaintiff had been diagnosed as HIV positive and would be made aware of this during a scheduled February 2, 2010 appointment. [Tr. 334-45, 347-48]. The report states that plaintiff had been experiencing symptoms such as nausea, vomiting, weight loss, diarrhea, weakness, fatigue, chills, night sweats, cough, and depression for four months prior to his hospitalization. [Tr. 334-35].

Plaintiff visited the Gengras Ambulatory Care Center at

---

[12] The January 22, 2010 clinic record is not entirely legible due to copy quality. Additionally, although the report is signed, the name of the doctor who signed the report cannot be distinguished from the signature. [Tr. 311].

Saint Francis Medical Center on February 2, 2010. [Tr. 320].
During this visit, he was informed that he was HIV positive.
[Tr. 320]. His records also indicate that he tested positive for
Hepatitis B. [Tr. 319-20]. The report notes that the
implications of plaintiff's HIV status were explained to him and
he was examined by Dr. Harry Conte.[13] [Tr. 319-20]. During this
visit he weighed 170 pounds. [Tr. 319]. Plaintiff had several
lab tests run that day at the direction of Dr. Luis Diez-
Morales, with whom he also spoke at the Care Center. [Tr. 320,
385-87].

Plaintiff returned to the Care Center on March 1, 2010 to
see Dr. Conte. [Tr. 318]. During this visit, he weighed 170.9
pounds. [Tr. 318]. His prescriptions and herbal supplements were
discussed and he was advised which medications could be taken at
different times of the day if he believed they were affecting
his sleep. [Tr. 318]. On March 1, 2010, plaintiff also had
several tests run at the direction of Dr. Robert Lyons. [Tr.
485, 488-93].

On March 4, 2010, plaintiff visited Dr. Diez-Morales in the
nephrology department at Saint Francis due to his HIV diagnosis
with renal failure. [Tr. 317]. He reported that he felt well,
had no cough, was not short of breath, and had no

---

[13] Several of Dr. Conte's medical reports contain small
portions that are illegible due to the handwriting and copy
quality.

gastrointestinal complaints, although he still felt tired and was experiencing a loss of appetite. [Tr. 317]. He had gained two pounds since his last appointment and weighed 172 pounds. [Tr. 317].

Plaintiff saw Dr. Lisa Rossi at the Care Center on March 9, 2010. [Tr. 316]. During this visit, he weighed 177 pounds. [Tr. 316]. He discussed his diet and medical history with the doctor. [Tr. 316]. She noted that he had been compliant with treatment. [Tr. 316].

On March 11, 2010, plaintiff saw Dr. Diez-Morales again, complaining of lower abdominal pain. [Tr. 314]. During this visit, he weighed 176.6 pounds. [Tr. 314]. After reviewing plaintiff's medical history, the doctor ordered lab tests [tr. 358-60] and encouraged plaintiff to drink plenty of fluids [tr. 314]. On March 12, 2010, plaintiff went for a CT scan of his abdomen and pelvis, as ordered by Dr. Diez-Morales. [Tr. 346]. The scan revealed chronic bilateral spondylosis L4-L5 with grade 1, 5 millimeters and anterolisthesis of L5 on S1. [Tr. 346]. On March 15, 2010, the doctor called plaintiff regarding the results of the lab tests ordered on March 11, 2010 and called in a prescription to the pharmacy for him based on the results. [Tr. 313].

On March 22, 2010, plaintiff had the following lab tests run at the direction of Dr. Manickaratnam: metabolic panel,

phosphorus, complete blood count with automated differential, and parathyroid hormone. [Tr. 354-57]. Several of his results were outside the normal ranges listed.

Plaintiff saw Dr. Conte again on March 26, 2010, at which time plaintiff weighed 177 pounds. [Tr. 312]. Dr. Conte ordered the following lab tests: a T cell screen, complete blood count with automated differential, metabolic panel, liver profile, and alpha-fetoprotein, which plaintiff had performed on March 29, 2010. [Tr. 349-53]. Several of his results, including his T cell numbers, were outside the normal ranges listed. [Tr. 349-53].

Plaintiff saw Dr. Manickaratnam on April 1, 2010 for a nephrology appointment. [Tr. 389]. He weighed 175.6 pounds at the time of this visit. [Tr. 389]. The doctor reported that plaintiff "feels well" and had no specific complaints. [Tr. 389]. He reviewed plaintiff's medication and progress of various lab numbers, noting possible medication to be prescribed in the future based on plaintiff's improvement. [Tr. 389].

Plaintiff returned to Dr. Conte on May 6, 2010 for a follow-up appointment. [Tr. 378]. During this visit, plaintiff weighed 183 pounds. [Tr. 378]. Dr. Conte continued him on his medications and noted that he would monitor his elevated lab results. [Tr. 378]. Also on May 6, 2010, plaintiff had a lipid profile test run. His cholesterol was within normal range, but his triglycerides and HDL were outside of the normal ranges

listed. [Tr. 373].

On June 3, 2010, plaintiff saw Dr. Manickaratnam in the nephrology department. [Tr. 377]. During this visit, plaintiff weighed 180 pounds. [Tr. 377]. The doctor noted that plaintiff was recovering from a cold, that he was anemic but his anemia was improving, and that he had allergies. [Tr. 377]. The doctor discussed plaintiff's medications and side effects and adjusted some of his medications. [Tr. 377].

On June 17, 2010, plaintiff met with Dr. Conte for a follow-up appointment. [Tr. 375]. During this visit, plaintiff weighed 180 pounds. [Tr. 375].

Plaintiff visited Saint Francis Hospital again on July 16, 2010, complaining of abdominal pain, vomiting, shortness of breath, and difficulty breathing. [Tr. 365-72, 499-509]. He was seen by Dr. Elizabeth Schiller and Dr. Michael Gutman. [Tr. 368]. Upon examination, no abnormalities were noted and plaintiff was described as being in "fair general health." [Tr. 366-67]. His intake form notes that his breath smelled like alcohol and plaintiff admitted drinking alcohol, smoking cigarettes, and using cocaine the night before his admission to the hospital. [Tr. 368]. Patient was discharged the same day with instructions to follow-up with his primary care doctor in two to four days. [Tr. 370].

A July 26, 2010 note reports that plaintiff appeared "very

confused about meds." [Tr. 374]. He was seen by Dr. Conte on July 29, 2010, at which time he weighed 176 pounds. [Tr. 374]. Plaintiff reported lack of energy and pain. [Tr. 374].

Plaintiff met with Dr. Conte on September 13, 2010 for a follow-up appointment. [Tr. 511]. He weighed 180.9 pounds during this visit. [Tr. 511]. The doctor noted that plaintiff was to return in six weeks for another follow-up appointment. [Tr. 511]. A final note from the clinic, on November 1, 2010, contains no additional relevant information about plaintiff's condition. [Tr. 584].

### b. Hartford Hospital

On September 2, 2010, plaintiff visited the clinic at Hartford Hospital to transfer his treatment, as he was reportedly unhappy with the care he was receiving at Saint Francis. [Tr. 566-67]. An intake assessment was performed on September 29, 2010, during which plaintiff stated that he had HIV, Hepatitis C,[14] liver disease, and kidney disease. [Tr. 567]. Plaintiff also reported his substance abuse problems and stated he was receiving treatment at InterCommunity Health Center. [Tr. 567].

Plaintiff returned to the clinic on October 13, 2010, complaining of lower abdominal pain. [Tr. 564]. He was seen by

_____

[14] The Court notes that plaintiff had previously tested positive for Hepatitis B, but not Hepatitis C. [Tr. 319-20].

Nurse Phillips, who reported that plaintiff repeatedly asked for an OxyContin prescription for his abdominal pain, which he was not given.[15] [Tr. 565]. During this visit, plaintiff weighed 186 pounds. [Tr. 564]. He was also given the flu vaccine. [Tr. 564].

During October 2010, plaintiff began participating in the clinic's pill box program to assist him in taking his medications. [Tr. 562].

On November 1, 2010, plaintiff returned to the clinic and saw Ms. Phillips. [Tr. 560]. She reported that he again complained of lower abdominal pain and requested OxyContin, stating that the medication he was taking did not relieve his pain. [Tr. 560]. She noted that plaintiff was grimacing and doubled over at points, but able to carry on a conversation smoothly. [Tr. 560]. The following day, November 2, 2010, plaintiff's wife called and reported that plaintiff was still in severe pain and was having bowel movements with blood. [Tr. 561]. Plaintiff was advised to go to the emergency room for evaluation. [Tr. 561]. Plaintiff did not go to the emergency room that day, reporting that he did not want to go through an examination, but did go for an examination and lab tests on November 5, 2010. [Tr. 561].

During his pill box medication review at the clinic on

---

[15] An October 29, 2010 note reported that plaintiff admitted using his wife's OxyContin prescription for his back pain. [Tr. 563].

November 15, 2010, plaintiff reported that his eyes would turn red and then yellow when he was tired. [Tr. 556]. He was told to call the clinic if he noticed his eyes yellowing again. [Tr. 556].

Plaintiff met with Ms. Phillips at the clinic on November 24, 2010 to receive the results of the November 5, 2010 examination. [Tr. 557]. During this visit, he weighed 176 pounds. [Tr. 557].

During plaintiff's medication review at the clinic on November 29, 2010, plaintiff reported that he was doing "okay," and that he had experienced a decrease in previously-felt burning sensations and diarrhea as a result of medication. [Tr. 554]. Ms. Phillips noted that plaintiff continued to request more pain medication. [Tr. 554].

On December 1, 2010, plaintiff went to the Hartford Hospital Institute of Living, a mental health center, for substance abuse treatment. [Tr. 617]. The report noted that plaintiff suffered from stress, lack of energy, poor sleep, loss of appetite, and feelings of hopelessness and worthlessness. [Tr. 617]. Plaintiff was noted to be well dressed, well developed, cooperative, pleasant, to have good eye contact, to speak coherently, and to appear to have a sad or dejected mood. [Tr. 617]. Plaintiff was noted to suffer from depression and sleep disturbance. [Tr. 617].

Plaintiff visited the clinic on December 13, 2010 for a medication review, during which it was noted that plaintiff reported issues sleeping and that he had taken too much of one medication. [Tr. 554]. By his following medication review, on December 27, 2010, it was reported that plaintiff was taking medications appropriately per the pillbox. [Tr. 555]. During the December 27, 2010 visit, plaintiff reportedly complained of abdominal pain, but was able to sit comfortably and converse throughout the visit.

On January 5, 2011, plaintiff returned to the Institute of Living for a follow-up appointment. [Tr. 618]. During this visit, it was noted that plaintiff had multiple psychiatric complaints, most of which revolved around anxiety and depression. [Tr. 618]. Side effects of his medications were discussed and his medications were adjusted. [Tr. 618].

On January 10, 2011, plaintiff saw Ms. Phillips for a follow-up appointment at the clinic, at which time he complained of side effects from medications, including headaches, shortness of breath, fever, and pain. [Tr. 553]. Plaintiff denied substance use. [Tr. 553]. Plaintiff also had a medication review on January 10, 2011, during which he reportedly rocked in his chair, but denied "any current issues." [Tr. 552]. Plaintiff was reminded of the importance of taking his medications as prescribed. [Tr. 552].

Plaintiff missed a medication review at the clinic on January 24, 2011 and appeared without an appointment four days later, but was not seen as there were no appointments at that time. [Tr. 550]. His appointment was conducted on January 31, 2011, during which he reported that he had missed his earlier appointment because he had been sick. [Tr. 551]. He stated he was feeling better at the time of the appointment. [Tr. 551]. Plaintiff appeared for a medication review at the clinic on February 14, 2011. [Tr. 548]. He complained of abdominal pain that was disturbing his sleep. [Tr. 548]. Plaintiff returned on February 28, 2011 for another medication review and again complained of abdominal pain. [Tr. 548].

During a March 14, 2011 medication review at the clinic, plaintiff reported nausea and dizziness as a result of medication. [Tr. 546]. At the March 14, 2011, appointment, plaintiff also complained of eye pain. [Tr. 546]. He saw Ms. Phillips regarding the eye pain and she referred him to a doctor who could examine his eyes that day. [Tr. 547].

On March 23, 2011, plaintiff appeared at the clinic as a walk-in complaining of a cough with colored phlegm, chest pain, wheezing, headache, and runny nose. [Tr. 544]. He was advised to increase his fluid intake and manage his symptoms with Nyquil or Robitussin and an Albuterol inhaler for wheezing and shortness of breath. [Tr. 544]. On March 23, 2011, plaintiff also visited

33

the Institute of Living. [Tr. 619]. It was noted that plaintiff suffered from anxiety and depression. [Tr. 619]. Plaintiff's medications were adjusted. [Tr. 619].

On March 28, 2011, plaintiff had a medication review at the clinic. [Tr. 545]. He reported lower abdominal pain and requested an appointment with a nephrologist. [Tr. 545]. Plaintiff appeared for another medication review appointment on April 11, 2011. [Tr. 542]. He complained of abdominal pain and depression, advising that he had a good session with his therapist that morning. [Tr. 542].

In April 14, 2011, plaintiff called the clinic and complained of lower back pain and painful urination.[16] [Tr. 542].

Plaintiff went to the emergency room on April 19, 2011 because of abdominal pain, but left because he was reportedly afraid his insurance would not cover the visit. [Tr. 540]. Plaintiff was advised by the clinic to follow the emergency room discharge instructions and return for severe abdominal pain. [Tr. 540]. He came to the clinic for a walk-in appointment on April 20, 2011, complaining of cough, nausea, vomiting, fever, dizziness, and lower back pain. [Tr. 540]. Plaintiff was taken to the emergency room for evaluation. [Tr. 541].

On April 26, 2011, plaintiff appeared at the clinic for a

---

[16] Plaintiff was called to come in for a urine sample that day, although it is unclear from the records whether he did so. [Tr. 543].

medication review. [Tr. 541]. He complained of slight pain in his groin and lower back. [Tr. 541]. He returned the following day and saw Ms. Phillips. [Tr. 539]. During this appointment, he weighed 197 pounds. [Tr. 539]. He reported that he had no abdominal pain, but stated he was experiencing nausea, cough, shortness of breath, and a headache. [Tr. 539]. Plaintiff reported that he had begun taking herbal medications to treat his T cells and kidneys. [Tr. 539]. He stated he had used a small amount of alcohol recently. [Tr. 539]. He was advised to go to the emergency room if he developed symptoms of pancreatitis. [Tr. 539].

Plaintiff returned to the clinic on May 2, 2011. [Tr. 536]. He reported pain in his back and left side of his back. [Tr. 536]. Plaintiff weighed 200 pounds at this appointment. [Tr. 536].

Plaintiff appeared at the clinic for a medication review on May 9, 2011. [Tr. 534]. He reported that he felt well. [Tr. 534]. Plaintiff had another medication review on May 23, 2011, during which he reported feeling good overall, specifically noting relief from diarrhea and nausea. [Tr. 534].

On June 1, 2011, plaintiff went to the Institute of Living. [Tr. 620]. He complained of stress caused by his housing situation and reported that his psychiatric medication was not helping. [Tr. 620].

35

During plaintiff's next medication review at the clinic, on June 6, 2011, he complained of fatigue and eye redness. [Tr. 535]. Plaintiff returned on June 20, 2011, for  another medication review. [Tr. 532]. On June 20, 2011, plaintiff complained that one of his hands was itching and peeling. [Tr. 532]. During his May and June appointments, it was noted that plaintiff had taken all of his medications according to instructions. [Tr. 534-35, 532].

Plaintiff had a follow-up appointment at the clinic on June 21, 2011. [Tr. 530]. During this appointment, he weighed 200 pounds. [Tr. 530]. Ms. Phillips saw him and examined his hand based on his continuing complaint of peeling and itchy skin on his hand. [Tr. 530]. She noted that she suspected psoriasis, recommended a medicated lotion, and advised plaintiff to return if the condition did not improve. [Tr. 530].

Plaintiff appeared at the clinic on July 1, 2011, for a medication review. [Tr. 531]. Plaintiff reported that his hand had improved. [Tr. 531]. He had taken all medications except for one dosage in accordance with instructions and was encouraged to follow exact instructions. [Tr. 531]. Plaintiff returned for a medication review appointment on July 18, 2011, during which it was noted that he had again complied with all medication instructions with the exception of one dosage. [Tr. 531]. Plaintiff reported that he had been experiencing periods of

36

intense pain, although he did not complain of this during the appointment. [Tr. 531]. During plaintiff's next medication review, on August 1, 2011, he forgot to bring his pill box and as such the clinic was unable to assess his compliance. [Tr. 528]. Plaintiff complained of an earache during his August 1, 2011 appointment, but stated he had no accompanying nasal or sinus congestion. [Tr. 528].

During an August 15, 2011 appointment at the clinic, plaintiff again complained of an earache. [Tr. 529, 526]. He also complained of groin pain and difficulty urinating and labs were ordered. [Tr. 529]. He weighed 197 pounds at this visit. [Tr. 529]. Plaintiff also had a medication review on August 15, 2011. [Tr. 527].

Plaintiff returned to the Institute of Living on September 7, 2011, at which time he reported that he had been experiencing "pain down below," since becoming sick, decrease in energy, and decrease in appetite. [Tr. 620]. He reported that his anxiety had improved somewhat. [Tr. 620]. Plaintiff stated that he occasionally drank, but not on a daily basis. [Tr. 620].

Plaintiff appeared at the clinic on September 26, 2011, for a medication review, during which he discussed obtaining prescriptions and his insurance status. [Tr. 592]. Plaintiff reported that he was feeling nervous "about all of this." [Tr. 592]. Notes in plaintiff's files record some difficulties

obtaining prescriptions during the month of September. [Tr. 592-
93]. On October 3, 2011, plaintiff came to the clinic for a
medication review. [Tr. 593]. During this visit, plaintiff
complained of a burning pain in his groin. [Tr. 593]. On October
10, 2011, plaintiff again appeared at the clinic for a
medication review, during which it was noted that he had been
compliant with his medications. [Tr. 594]. Plaintiff complained
of lower abdominal pain during this visit. [Tr. 594]. Plaintiff
failed to appear for his October 19, 2011, medication review.
[Tr. 595]. He returned for a medication review on October 24,
2011, stating he had been sick the previous week. [Tr. 595].
Plaintiff reported "I don't feel good, I'm in pain," but was
reportedly unable to further describe his symptoms. [Tr. 595].

Plaintiff appeared at the clinic on November 7, 2011, for a
medication review, during which it was noted that he had been
compliant with his medications. [Tr. 597]. Plaintiff reportedly
complained of groin pain. [Tr. 597]. Additionally, plaintiff
stated he had recently seen a nephrologist, although the clinic
noted that there was no record of this visit. [Tr. 597].
Plaintiff returned to the clinic on November 21, 2011, for a
medication review appointment, during which it was again noted
that plaintiff had been compliant with his medication. [Tr.
590]. Plaintiff reportedly complained of the "usual pain," and
stated that he was to see a urologist at the recommendation of

38

his nephrologist.[17] [Tr. 590]. Plaintiff returned on December 6, 2011, for a medication review appointment, during which it was noted that he had been compliant with all medications. [Tr. 591].

On December 20, 2011, plaintiff was referred to the urology department by Dr. Ankita Kadakia due to difficulties urinating that had lasted for more than a year, rectal pressure, pain during intercourse, and an enlarged prostate. [Tr. 622]. It was noted that plaintiff had HIV and that his creatinine levels were elevated. [Tr. 622]. Plaintiff had a urology consult on January 31, 2012, during which the provider reviewed his medical history and recent lab results. [Tr. 623].

On January 12, 2012, plaintiff reported to the Institute of Living that he was "stressed out," sleeping more and waking up tired, and had poor concentration. [Tr. 620]. He stated that he wanted to drink, but denied using alcohol recently. [Tr. 620-21]. He reported that he had contemplated suicide, but then would decide he wanted to live. [Tr. 620]. It was noted that plaintiff suffered from depression and alcohol abuse. [Tr. 621].

A March 24, 2012 note from Dr. Kadakia instructs plaintiff to take listed medications as prescribed, maintain a diabetic

---

[17] A December 2, 2011, phone call from plaintiff's wife is also noted, during which plaintiff's wife reported that he was experiencing severe groin pain and that plaintiff was to see a urologist at the recommendation of his nephrologist. [Tr. 590].

diet, and to follow up with Dr. Kadakia regarding HIV and with Dr. Peters regarding urinary problems. [Tr. 631-32].

### c.   InterCommunity Health Center

Plaintiff initially visited InterCommunity Health Center on September 10, 2009 and met with staff member Jean Konon,[18] who completed an initial assessment. [Tr. 394-404]. Plaintiff reported that he had recently gotten out of jail and was on probation, was looking for work, and wanted to stop drinking. [Tr. 394]. He stated he was anxious, could not sleep, had trouble keeping food down, and was worried about going back to jail. [Tr. 394]. He reported that he lived with his wife. [Tr. 394]. In terms of social interactions, he reported seeing friends and speaking with them on the phone, but stated he was not involved in church or community activities. [Tr. 394-95]. He reported that he was unemployed, but had good performance and attendance at his previous jobs and did not drink while working. [Tr. 395]. Plaintiff was diagnosed with alcohol dependence and anxiety disorder and assigned a Global Assessment of Functioning ("GAF") score of 29, which also accounted for psychosocial environmental problems related to interactions with the legal system. [Tr. 403]. Plaintiff was referred to a treatment group

---

[18] Dr. Ann Price co-signed the assessment. [Tr. 404]. She continued to co-sign plaintiff's records when he returned to InterCommunity Health Center. [Tr. 426, 435, 442, 449, 466, 470, 579, 616].

for help achieving sobriety and to a career opportunity orientation. [Tr. 403].

Plaintiff met with Ms. Konon again on September 14, 2009, to create an initial Individual Service Plan. [Tr. 443-49]. Plaintiff reported that he wanted to achieve sobriety and reduce the anxiety and stress in his life. [Tr. 443]. Along with Ms. Konon, plaintiff set goals to help him work toward sobriety within the following year. [Tr. 443-44].

Plaintiff returned to InterCommunity Health Center on November 18, 2009 [tr. 436-42], and January 20, 2010 [tr. 429-35], at which times he met with licensed clinical social worker Brian Cardona. During both visits, Mr. Cardona noted that plaintiff had been attending weekly psycho-education and social skills groups, which he planned to continue following their meeting. [Tr. 435, 442]. Plaintiff reported that he had remained sober and believed he was doing a good job of regulating his emotions. [Tr. 429, 436]. Plaintiff and Mr. Cardona reviewed and revised plaintiff's goals for maintain sobriety. [Tr. 429-30, 436-37].

Plaintiff met with nurse Helen Bradley on January 28, 2010 for a psychiatric evaluation. [Tr. 423-28]. He reported that he was having difficulty sleeping and had recently been discharged from the hospital for dehydration. [Tr. 423]. Plaintiff was

diagnosed[19] with alcohol dependence and major depressive order
(single episode severe without psychotic features) and again
assigned a GAF score of 29, which again also accounted for
psychosocial and environmental problems related to interactions
with the legal system as a result of his pending charges for
assault and risk of injury to a minor. [Tr. 426]. The evaluation
also notes that he complained of hypertension and shortness of
breath. [Tr. 426]. Ms. Bradley referred him to an early recovery
group, ordered labs, and stated he should return for follow-up
in four weeks. [Tr. 425].

Plaintiff returned to meet with Mr. Cardona on April 8,
[tr. 421-22], April 16, [tr. 419-20], April 27, [tr. 417-18],
May 10, [tr. 415-16], May 17, [tr. 413-14], June 16, [tr. 411-
12], and July 9, 2010 [tr. 409-10]. During each visit, Mr.
Cardona reported no relative changes in plaintiff's condition,
noted that plaintiff had maintained sobriety, and stated that
plaintiff believed he had made some progress. [Tr. 409-22].
During the April 8, 2010 visit, Mr. Cardona stated that he and
plaintiff discussed plaintiff's stress and anxiety, as well as
how plaintiff could handle these difficulties. [Tr. 422]. On
April 16, 2010, Mr. Cardona reported that they discussed the
benefits of spirituality. [Tr. 420]. On April 27, 2010, Mr.

---

[19] Although Ms. Bradley and Dr. Price signed the evaluation,
Carol Dumond is listed as the individual who diagnosed
plaintiff. [Tr. 426]. She did not sign the evaluation.

Cardona noted that they discussed skills plaintiff was acquiring in therapy. [Tr. 418]. On May 10, 2010, plaintiff discussed his past and reported that he had found spirituality helpful in maintaining sobriety. [Tr. 416]. On May 17, 2010, plaintiff discussed how he was becoming more active in his church. [Tr. 414]. On June 16, 2010, Mr. Cardona discussed ways to manage stress and anxiety. [Tr. 412]. On July 17, 2010, plaintiff and Mr. Cardona discussed plaintiff's concerns about an upcoming court date and negative emotions. [Tr. 410].

During a July 23, 2010 meeting, Mr. Cardona reported that plaintiff had experienced changes in his behavioral functioning or medical condition based on plaintiff's report that he was in the hospital a week prior to the visit because of the negative side effects of a medication. [Tr. 407]. Mr. Cardona also reported that plaintiff had not maintained sobriety, but reported drinking and using cocaine in the previous week. [Tr. 407]. Mr. Cardona noted that plaintiff reported he relapsed to drug and alcohol use after he became dizzy and fell due to the side effects of a medication, which he had since stopped taking. [Tr. 408].

Plaintiff met with Mr. Cardona on August 16, 2010, at which time Mr. Cardona noted that plaintiff reported an increase in stress due to an upcoming court date and that he had relapsed to alcohol and cocaine use since their last visit. [Tr. 405]. Mr.

43

Cardona and plaintiff discussed plaintiff's stress associated with his illness, plaintiff's desire to become involved in his church, and ways to manage stress. [Tr. 406].

Plaintiff met with Mr. Cardona again on October 1, 2010. [Tr. 464-67]. Plaintiff reported depression and lack of energy and indicated that he had recently changed healthcare providers from Saint Francis to Hartford Hospital.  [Tr. 464]. Mr. Cardona noted that plaintiff reported using cocaine twice per month and drinking two or three times a week. [Tr. 464]. Mr. Cardona stated that plaintiff had recently returned to church. [Tr. 464]. Mr. Cardona confirmed plaintiff's diagnoses of alcohol dependence and anxiety disorder and noted that plaintiff also suffered from legal, economic, and occupational problems. [Tr. 466]. Considering these diagnoses and environmental problems, he assigned him a GAF score of 35. [Tr. 466].

Plaintiff returned to Mr. Cardona on March 1, 2011. [Tr. 468-70]. Mr. Cardona noted that plaintiff had "recently re-engaged in therapy," and had maintained sobriety for the previous three months. [Tr. 468]. Mr. Cardona stated that plaintiff reported depression, lack of energy, difficulty sleeping, lack of motivation, anger, and pain in his kidneys and chest. [Tr. 468]. Mr. Cardona confirmed his previous diagnoses and environemtnal problems and again assigned a GAF score of 35. [Tr. 470].

44

Plaintiff saw Mr. Cardona again on June 1, 2011. [Tr. 471-73]. Mr. Cardona noted that plaintiff had not used drugs in the past three months, but had used alcohol. [Tr. 471-72]. Mr. Cardona stated that plaintiff reported a decrease in anger and symptoms related to HIV including pain in his kidneys and chest and lack of energy. [Tr. 471]. Plaintiff still reported depression and lack of motivation. [Tr. 471]. Mr. Cardona confirmed plaintiff's previous diagnoses and environmental problems and assigned him a GAF score of 58. [Tr. 473].

Plaintiff returned to see Mr. Cardona on October 14, 2011. [Tr. 577-79]. Plaintiff reported that he was not using cocaine and had not used alcohol in the last month. [Tr. 577]. Mr. Cardona noted that plaintiff reported stress and depression due to finances and "problems accessing services," as well as health problems including kidney pain, chest pain, and lack of energy. [Tr. 577]. Mr. Cardona confirmed plaintiff's previous diagnoses and environmental problems and assigned him a GAF score of 58. [Tr. 579].

Plaintiff saw Mr. Cardona again on January 6, 2012. [Tr. 613-16]. Mr. Cardona noted that plaintiff had recently re-engaged in therapy and was using support from friends, family, providers, and his church to deal with negative emotions. [Tr. 613]. Plaintiff reported stress, depression, and difficulties with sleep. [Tr. 613]. Mr. Cardona also noted that plaintiff

45

relayed that his HIV diagnoses had been changed to AIDS based on his T cell count dropping, but that he had changed medications and was hoping to bring it back up. [Tr. 613]. Plaintiff reported he was not using drugs or alcohol. [Tr. 614]. Mr. Cardona confirmed plaintiff's previous diagnoses, added a "recent diagnosis of AIDS," and gave plaintiff a GAF score of 51. [Tr. 615-16].

### d.   Medical Opinions

On September 5, 2010, Dr. Conte completed an HIV Questionnaire. [Tr. 454-55]. He stated that plaintiff had been diagnosed with AIDS after his hospitalization in February 2010. [Tr. 454]. He reported no evidence of opportunistic infection, neoplasms, or weight loss. [Tr. 454]. He stated that plaintiff had no limitations in activities of daily living. [Tr. 455]. He reported that plaintiff had not experienced changes in mental status and had not been referred for psychiatric evaluation or treatment. [Tr. 455].

On April 16, 2012, Mr. Cardona filled out a Mental Impairment Questionnaire and wrote a letter addressed to the Social Security Administration. [Tr. 638-44]. He explained that he was a licensed clinical social worker at InterCommunity, where plaintiff had been receiving services since October 2009. [Tr. 638]. Mr. Cardona wrote that plaintiff suffered from post-traumatic stress disorder, which negatively impacted his

concentration. [Tr. 638]. He wrote that plaintiff was able to maintain focus for approximately 20 minutes during individual therapy, but had stopped attending group therapy because he had difficulty paying attention after approximately 30 minutes. [Tr. 638]. Mr. Cardona wrote that plaintiff also suffered problems related to anxiety, stress, depression, irritability, hopelessness, mood swings, and panic attacks.[20] [Tr. 638]. Mr. Cardona stated that plaintiff's current GAF score was 35, and

---

[20] When asked to check boxes next to signs and symptoms plaintiff was experiencing, Mr. Cardona checked the following boxes: (1) anhedonia or pervasive loss of interest in almost all activities; (2) appetite disturbance with weight change; (3) decreased energy; (4) thoughts of suicide; (5) blunt, flat or inappropriate behavior; (6) feelings of guilt or worthlessness; (7) generalized persistent anxiety; (8) mood disturbance; (9) difficulty thinking or concentrating; (10) recurrent and intrusive recollection of a traumatic experience, which are a source of marked distress; (11) persistent disturbances of mood or affect; (12) persistent nonorganic disturbances of vision, speech, hearing, use of a limb, movement, and its control, or sensation; (13) change in personality; (14) paranoid thinking or inappropriate suspiciousness; (15) recurrent obsessions of compulsions which are a source of marked distress; (16) emotional withdrawal or isolation; (17) psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities; (18) intense and unstable interpersonal relationships and impulsive and damaging behavior; (19) perceptual or thinking disturbances; (20) emotional lability; (21) flight of ideas; (22) unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury; (23) loosening of associations; (24) illogical thinking; (25) sleep disturbances; and (26) recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. [Tr. 640].

further stated that this was also the highest GAF score he had
been assigned in the past year. [Tr. 639]. He noted that
plaintiff's psychiatric condition exacerbated his pain and that
plaintiff continued "to experience pain which he described as
getting worse." [Tr. 642]. Regarding plaintiff's work-related
abilities, Mr. Cardona stated that plaintiff had a "limited but
satisfactory" ability to perform the following functions: (1)
remember work-like procedures; (2) understand and remember very
short and simple instructions or detailed instructions; (3)
carry out very short and simple instructions or detailed
instructions; (4) maintain attention for two hour segments; (5)
maintain regular attendance and be punctual within customary,
usually strict tolerances; (6) work in coordination with or
proximity to others without being unduly distracted; (7) make
simple work-related decisions; (8) perform at a consistent pace
without an unreasonable number or length of rest periods; (9)
ask simple questions or request assistance; (10) accept
instructions and respond appropriately to criticism from
supervisors; (11) get along with co-workers or peers without
unduly distracting them or exhibiting behavioral extremes; (12)
be aware of normal hazards and take appropriate precautions;
(13) maintain socially appropriate behavior; and (14) adhere to
basic standards of neatness and cleanliness. [Tr. 641-42]. He
stated he was "unable to meet competitive standards" in

interacting appropriately with the general public. [Tr. 642].
Mr. Cardona stated that plaintiff had "no useful ability" to
carry out the following functions: (1) sustain an ordinary
routine without special supervision; (2) complete a normal
workday and workweek without interruptions from psychologically
based symptoms; (3) respond appropriately to changes in a
routine work setting; (4) deal with normal work stress; (5) set
realistic goals or make plans independently of others; (6) deal
with the stress of semiskilled and skilled work; (7) travel in
an unfamiliar place; and (8) use public transportation. [Tr.
641-42]. He opined that plaintiff experienced extreme
restrictions on his activities of daily living and had extreme
difficulties maintaining social functioning and maintaining
concentration, persistence, or pace. [Tr, 643]. He stated that
plaintiff had experienced four or more episodes of
decompensation, each lasting at least two weeks, during a 12
month period. [Tr. 643]. He opined that plaintiff's issues would
cause him to be absent from work more than four days each month.
[Tr. 644]. He answered "no" when asked whether substance abuse
contributed to plaintiff's described limitations. [Tr. 644]. Mr.
Cardona stated that plaintiff was unable to process medical care
instructions or listen to work supervisors when these issues
arose. [Tr. 638]. Finally, Mr. Cardona stated that plaintiff was
aware of the negative consequences of substance abuse and that

plaintiff's problems existed "even when he has not been drinking or using drugs." [Tr. 638].

###### e.   Consultative Examination

Dr. Jesus Lago conducted a consultative examination of plaintiff on August 25, 2010. [Tr. 450-53]. Dr. Lago noted that plaintiff was able to travel the ten miles to the appointment via public transportation, arriving by himself and on time. [Tr. 450]. The doctor believed that plaintiff was "a reliable historian." [Tr. 450]. Dr. Lago noted that plaintiff reported depression, difficulty sleeping, weight loss, and ongoing drug and alcohol use. [Tr. 450]. Dr. Lago stated that plaintiff reported he helped with light chores around the house, took care of his activities of daily living, functioned independently, and sometimes went out with his wife, although he mainly stayed at home. [Tr. 451]. Dr. Lago described plaintiff as cooperative, pleasant, meticulously dressed and groomed, and attentive, with normal posture, gait, speech, and general motor behavior. [Tr. 450, 452]. The doctor found that plaintiff was able to follow simple commands and instructions and had fair insight. [Tr. 451]. Dr. Lago diagnosed plaintiff with major depressive disorder (single episode, moderate), polysubstance dependence (alcohol, cocaine, heroin), acquired immunodeficiency syndrome, Hepatitis C, liver disease, kidney disease, hypertension, and high cholesterol and assigned him a GAF score of 60. [Tr. 452].

50

The doctor recommended that plaintiff be treated in a long-term
inpatient rehabilitation program, finding that plaintiff was not
successful in the outpatient program at InterCommunity. [Tr.
453]. He stated that plaintiff understood he had a substance
abuse problem, although it was ongoing. [Tr. 451]. The doctor
stated that plaintiff was able to handle funds in his own best
interest and that plaintiff had gotten along well with
supervisors and coworkers when working. [Tr. 452-53].

### f.   State Agency Assessments

A Mental Residual Functional Capacity Assessment was
completed by Dr. Kirk Johnson on September 2, 2010.[21] [Tr. 105-
06]. Regarding sustained concentration and persistence
limitations, the doctor found that plaintiff was not
significantly limited in his ability to carry out very short and
simple instructions, perform activities within a schedule,
maintain regular attendance, be punctual within customary
tolerances, sustain an ordinary routine without special
supervision, work in coordination with or in proximity to others
without being distracted by them, and make simple work-related

---

[21] Dr. John Gambill performed a Medical Consultant's Review
of Psychiatric Review Technique [tr. 456-59] and Medical
Consultant's Review of Mental Residual Functional Capacity
Assessment [tr. 460-61] on August 8, 2010. Both reports appear
to review this assessment as they refer to a Mental RFC
Assessment from September 2, 2010. In both reports, Dr. Gambill
noted that he agreed with the September 2, 2010 assessment. [Tr.
456-61].

decisions; and was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. [Tr. 105-06]. The doctor explained that plaintiff's symptoms limited his ability to maintain focus and motivation with detailed and protracted tasks, but that he would do fine with simple to moderately detailed ones. The doctor also noted that plaintiff had not used substances on the job and was able to complete two-hour work periods. [Tr. 106]. Regarding social interaction limitations, Dr. Johnson found that plaintiff's ability to interact appropriately with the general public was moderately limited. [Tr. 106]. He found no significant limitations on plaintiff's abilities to ask simple questions, request assistance, accept instructions, respond appropriately to criticism from supervisors, get along with coworkers or peers without distractions, maintain socially appropriate behavior, and adhere to basic standards of cleanliness. [Tr. 106]. The doctor noted that due to depression, plaintiff could not sustain full-time contact with the public during work. [Tr. 106]. Dr. Johnson found that plaintiff had no understanding, memory, or adaptation limitations. [Tr. 105-06]. On December 22, 2010, Dr. Thomas Hill also performed a Mental

Residual Functional Capacity Assessment, which confirmed Dr. Johnson's findings. [Tr. 118-19].

A Physical Residual Functional Capacity Assessment was completed by Dr. Firooz Golkar on September 20, 2010.[22] [Tr. 104-05]. With regard to exertional limitations, Dr. Golkar found that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; sit, stand and/or walk with normal breaks for a total of approximately six hours in an eight-hour workday; and push and/or pull, including the operation of hand and/or foot controls, for an unlimited amount of time other than as otherwise limited by lifting and carrying limitations. [Tr. 104]. The doctor noted that plaintiff was HIV positive, stating that plaintiff's "symptomatic HIV" caused his exertional limitations. [Tr. 104]. Regarding postural limitations, Dr. Golkar found that plaintiff could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl. [Tr. 104-05]. Dr. Golkar found no manipulative, visual, communicative, or environmental limitations. [Tr. 105]. On December 23, 2010, Dr. Virginia Rittner also performed a Physical Residual Functional Capacity

---

[22] Dr. Alla Zaver performed a Medical Consultant's Review of Physical Residual Functional Capacity Assessment on October 22, 2010. [Tr. 462-63]. The report appears to review this assessment as it refers to a Physical RFC Assessment from September 20, 2010. Dr. Zaver agreed with the September 20, 2010 assessment. [Tr. 462-63].

Assessment, which confirmed Dr. Golkar's findings. [Tr. 116-18].

**6.   Exhibit 15E**

During the April 5, 2012 hearing, the ALJ discussed the source of Exhibit 15E [Tr. 274-77] with plaintiff's attorney [Tr. 55-58, 84-86] and with plaintiff [Tr. 82-84]. Although designated as a form for a medical provider to fill out, the ALJ noted that it was signed by plaintiff and his wife, with plaintiff's name scratched out and "Brian" written instead. [Tr. 55, 277]. She further noted that it appeared as if plaintiff's wife had filled out the majority of the form, also noting two distinct handwritings throughout the form. [Tr. 55]. Plaintiff testified he had initially filled out the form in 2010 with his wife and then brought the form to Brian Cardona, his therapist, who signed it. [Tr. 83-84]. During the hearing, plaintiff's attorney requested additional time following the hearing to obtain an explanation from Mr. Cardona regarding the form, which the ALJ granted. [Tr. 56-57].

An April 16, 2012 letter signed by Mr. Cardona explains that the form was first filled out by plaintiff and his wife and then brought to Mr. Cardona, who "crossed out some of the information that [plaintiff] had filled out and initialed his changes." [Tr. 290]. It is unclear if the April 16, 2012 letter was written by Mr. Cardona or if he simply signed it. It is written almost entirely in third person, but is signed by Mr.

Cardona and includes a closing note to "contact me." [Tr. 290].

The form, which was completed on March 29, 2010, states that plaintiff suffers from alcohol dependence and anxiety disorder. [Tr. 274]. It states that plaintiff's substance abuse is in remission. [Tr. 274]. It reports that plaintiff has difficulties with memory, anxiety, impaired judgment, and depression.[23] [Tr. 274-75]. In response to questions about plaintiff's activities of daily living, whom ever filled out the form[24] noted that plaintiff had no problem taking care of his personal hygiene and physical needs and had an obvious problem using good judgment regarding safety and dangerous circumstances, using appropriate coping skills to meet the ordinary demands of a work environment, and handling frustration appropriately. [Tr. 275]. The form notes no obvious problem regarding any activities of social interaction. [Tr. 276]. Regarding plaintiff's task performance, it notes no obvious

---

[23] The form is difficult to read due to the copy quality and two handwritings, including portions of the report that have been crossed out and written over. Some of the descriptions of plaintiff's symptoms are not legible. [Tr. 274-75].

[24] On April 18, 2012, when plaintiff's attorney submitted the April 16, 2012 letter, he reported to the ALJ that "[plaintiff] recalls that [he and Mr. Cardona] discussed the ratings in questions 7-9 [relating to activities of daily living, social interaction, and task performance], with Mr. Cardona ultimately circling the responses that are evident on these pages." [Tr. 291]. There is no other evidence in the record as to who filled out this portion of the form. Mr. Cardona's initials, which appear at other places on the form, are not evident in this section.

problem with carrying out single step instructions and performing basic work activities at a reasonable pace, a serious problem carrying out multi-step instructions and performing work activity on a sustained basis, and a very serious problem focusing long enough to finish assigned simple activities and changing from one simple task to another. [Tr. 276].

### V.   STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry. The court must first decide whether the Commissioner applied the correct legal principles in making the determination. Johnson v. Brown, 817 F.2d 983, 985 (2d Cir. 1987). Next, the court must decide whether the determination is supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted); see also Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. Gonzales v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977). The court may not decide facts, reweigh evidence, or substitute its own judgment for that of the Commissioner. Tejada v. Apfel,

167 F. 3d 770, 773 (2d Cir. 1999); Dotson v. Shalala, 1 F.3d
571, 577 (7th Cir. 1993); Burden v. Astrue, Civ. No. 3:07CV0642
(JCH), 2008 WL 5083138, at *8 (D. Conn. 2008). The court must
scrutinize the entire administrative record to determine the
reasonableness of the ALJ's factual findings. Perez v. Chater,
77 F.3d 41, 46 (2d Cir. 1996). The court's responsibility is
always to ensure that a claim has been fairly evaluated. Grey v.
Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis to doubt whether the ALJ
applied correct legal principles, application of the substantial
evidence standard to uphold the ALJ's decision "creates an
unacceptable risk that the claimant will be deprived of the
right to have [his] disability determination made according to
correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504
(2d Cir. 1987) (citation and quotation marks omitted). To enable
a reviewing court to decide whether the determination is
supported by substantial evidence, the ALJ must set forth the
"crucial factors in any determination" with sufficient
specificity. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.
1984). The ALJ is free to accept or reject the testimony of any
witness, but he must support a finding that a witness is not
credible with enough detail so as to permit an intelligible
review of the record. Williams ex rel. Williams v. Bowen, 859
F.2d 255, 260-61 (2d Cir. 1988). Moreover, when a finding is

potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding. Giannasca v. Astrue, 7:07-cv-341 (VB), 2011 WL 4445141, at *4 (S.D.N.Y. 2011); Peoples v. Shalala, No. 92 CV 4113, 1994 WL 621922, at *4 (N.D. Ill. Nov. 4, 1994).

## VI.  PLAINTIFF'S APPEAL

On appeal, plaintiff asserts the following arguments for reversal or remand:

1. Whether the ALJ properly assessed plaintiff's credibility;

2. Whether the ALJ gave proper weight to the opinions of plaintiff's social worker, Brian Cardona.

3. Whether the ALJ properly determined that substance abuse was material to the determination of disability; and

4. Whether the ALJ properly determined that there were jobs existing in significant numbers in the national economy that plaintiff could perform, absent substance abuse.

The Court will consider each of plaintiff's arguments in turn.

## VII. DISCUSSION

### A.  Credibility of Plaintiff's Subjective Complaints

Plaintiff argues that "the ALJ has not cited evidence sufficient to call Mr. Daniel's credibility into question. The

few details cited do not suggest a credibility issue. . . [and the ALJ] was not entitled to disbelieve the claimant on the record of this case." [Doc. #17-1 at 18].

The ALJ is required to assess the credibility of the plaintiff's subjective complaints. 20 C.F.R. § 416.929. The Second Circuit follows a two-step process when looking at credibility assessments. See Martin v. Astrue, 07CIV3911 (LAP), 2009 WL 2356118, at *10 (S.D.N.Y., July 30, 2009). First, the ALJ must determine whether the record demonstrates that the plaintiff possesses a medically determinable impairment that could reasonably produce the alleged symptoms. 20 C.F.R. § 416.929(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled."). Second, the ALJ must assess the credibility of the plaintiff's complaints regarding the intensity of the symptoms. See Martin, 2009 WL 2356118 at *10. Here, the ALJ must first determine if objective evidence alone

59

supports the plaintiff's complaints; if not, the ALJ must consider other factors laid out in 20 C.F.R. § 416.929(c). See, e.g., Skillman v. Astrue, No. 08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010). These factors include activities of daily living, medications and the plaintiff's responses to medications, treatment other than medication, and other relevant factors concerning limitations. 20 C.F.R. § 416.929(c)(3)(i)-(iv). The ALJ must consider all the evidence in the case record. SSR 96-7p, 1996 WL 374186, at *5 (Jul. 2, 1996). The ALJ's credibility finding "must contain specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4. Credibility findings must "be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citation omitted).

Although the ALJ is required to set forth her findings with sufficient specificity to permit intelligent plenary review, "[a]n ALJ does not have to state on the record every reason justifying a decision. . . . '[A]n ALJ is not required to discuss every piece of evidence submitted. . . . An ALJ's failure to cite specific evidence does not indicate that such

evidence was not considered.'" Brault v. Soc. Sec. Admin.,
Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citing Black v. Apfel,
143 F.3d 383, 386 (8th Cir.1998)).

Additionally, in reviewing an ALJ's decision, the Court
only looks at whether the ALJ's decision is supported by
substantial evidence; the Court does not engage in new fact-
finding. Where evidence is susceptible to more than one rational
interpretation, the ALJ's conclusion must be upheld as long as
it is a rational interpretation. Anderson v. City of Bessemer
City. N.C., 470 U.S. 564, 574 (1985) ("Where there are two
permissible views of the evidence, the factfinder's choice
between them cannot be clearly erroneous."); see also Mongold v.
Astrue, 09-CV-855S, 2010 WL 2998919 at *3 (W.D.N.Y. July 27,
2010) (citing Rutherford v. Schweiker, 685 F.2d 60, 65 (2d Cir.
1982)).

Here, after a detailed examination of the record, the ALJ
made the following statement regarding plaintiff's credibility:

> If the claimant stopped the substance use, the undersigned
> finds that the claimant's medically determinably
> impairments could reasonably be expected to produce the
> alleged symptoms; however, the claimant's statements
> concerning the intensity, persistence and limiting effects
> of these symptoms are not credible to the extent they are
> inconsistent with the residual functional capacity
> assessment for the reasons explained below. The medical
> evidence shows that although the claimant has an HIV
> diagnosis with an abnormally low CD4 count, there is no
> evidence of opportunistic infections or weight loss,
> despite the claimant's allegations. It appears that his HIV
> is asymptomatic but the undersigned has accounted for the

claimant's alleged symptoms nonetheless. He testified that
he is unable to lift due to fatigue and his medications
make him sleep so he is unable to help his wife around the
house. Therefore, the undersigned has limited him to a
light exertional level of activity with occasional
stooping, crouching, crawling, kneeling, balancing and
climbing of ramps and stairs, and no climbing of ladders,
ropes or scaffolds. With respect to his mental impairments,
the medical evidence shows that shortly after receiving
treatment for a relapse, the claimant's mental condition
improves. Accordingly, during these times, he reports
increased activities such as becoming more involved in
church and being able to cope with his emotions better.
Nonetheless, he continues to experience mood disturbances
that result in limitations in social functioning and task
performance. Consequently, the undersigned further limits
his capacity for light work to understanding, remembering
and carrying out simple to moderately complex instructions,
occasional interaction with the general public, and no
strict rate, pace, or production requirements. The residual
functional capacity has fully accounted for the claimant's
abilities and limitations.

[Tr. 25].

Plaintiff argues that the ALJ erred by (1) drawing a

negative impression of plaintiff's credibility from the

circumstances surrounding Exhibit 15E; (2) drawing a negative

impression of plaintiff's credibility based on his substance

abuse; (3) mentioning plaintiff's criminal history;  and (4)

commenting on his physical appearance during the hearing. [Doc.

#17-1 at 8-18]. Each argument will be addressed in turn.

As to Exhibit 15E, plaintiff devotes a substantial number

of pages explaining what he believes to be the innocuous

circumstances of how the document came to be filled out, signed,

crossed out, written over, and signed again. [Tr. 8-18].

Plaintiff's interpretation of these circumstances is certainly

reasonable, but the ALJ's interpretation is reasonable as well.

Regarding Exhibit 15E, the ALJ stated:

> It was discovered at the hearing that a Medical Source
> Statement dated March 29, 2010 was completed by the
> claimant and his wife, and supposedly cosigned by the
> claimant's therapist, Brian Cardona. Exhibit 15E. The
> record was left open for two weeks to obtain further
> information from Mr. Cardona concerning the completion of
> this form. In a post hearing brief, the claimant's
> attorney, Dennis G. Ciccarillo, alleged that the claimant
> gave the form to Mr. Cardona, who initialed the document.
> Attorney Ciccarillo then submitted a letter signed by Mr.
> Cardona, explaining that the form was eventually brought to
> him and he made changes and initialed the changes. Exhibit
> 18E. The undersigned affords little weight to both the
> Medical Source Statement and the supporting letter. The
> Statement is entitled to very little weight, because it was
> only coincidentally discovered upon questioning that the
> claimant filled out the document with his wife and the
> written reports are in different handwriting, some circled
> and some not. Additionally, the supporting letter is also
> given very little weight because it is written in the third
> person, as if it was written for Mr. Cardona to sign. As
> such, it is not [an] independent statement or corroboration
> from Mr. Cardona regarding how his initials came to be on
> the Statement, and there is no reasonable explanation why
> he did not fill out the form himself. Therefore, the
> undersigned does not accept the Statement as a medical
> opinion and the circumstances of the claimant's completion
> of the document and how this matter became known to the
> court do not contribute favorably to the claimant's
> credibility.

[Tr. 27-28]. A review of the hearing transcript [tr. 52-94],

Exhibit 15E [tr. 274-77], and Mr. Cardona's letter [tr. 290],

shows that there is substantial evidence in the record to

support the ALJ's finding that plaintiff was not initially

forthcoming about the authorship of the document, but rather the

fact that plaintiff and his wife had filled out portions of the form only came to light as a result of the ALJ's questioning during the hearing. [See Tr. 55]. The Court's role is to determine whether the ALJ's credibility determination is supported by substantial evidence and not, as plaintiff invites, to re-visit the credibility determination. Where, as here, the ALJ has chosen one of multiple rational interpretations of the evidence, the Court will not impose an alternate interpretation of the evidence. See Anderson, 470 U.S. at 574.

As to plaintiff's substance abuse, although plaintiff argues that the ALJ may have impermissibly drawn a negative view of his credibility based on his substance abuse, plaintiff does not point to any portion of the ALJ's opinion in which the ALJ stated that she drew such a conclusion, or even considered plaintiff's substance abuse in determining plaintiff's credibility. [Doc. #17-1 at 18]. Plaintiff does not explain why he believes that the ALJ considered this in her credibility determination and the Court will not attempt to guess. The ALJ mentions plaintiff's substance abuse in her opinion, which she must do in order to assess the material impact of plaintiff's substance abuse on her disability determination. To the extent plaintiff's argument is premised on the ALJ's mere *mention* of substance abuse, such argument fails.

Plaintiff's third argument, regarding his criminal history,

64

is similar to that regarding his substance abuse. Plaintiff admits that the ALJ did not tie plaintiff's criminal history to her credibility analysis, but nevertheless argues it was error for her to discuss his legal trouble, stating "[t]hough not cited by the ALJ as influencing her credibility determination, the ALJ reiterated, at several different points . . . the fact that Mr. Daniel has had legal problems, sometimes specifying the type of legal problem." [Doc. #17-1 at 17]. Plaintiff correctly notes that the ALJ mentions plaintiff's criminal history approximately five times in the course of her opinion. [Tr. 19, 20, 24]. However, upon review, these statements were not connected to a credibility analysis, but rather were included as part of the ALJ's review of the medical evidence in order to explain the circumstances of plaintiff seeking treatment or, in one instance, to explain why the ALJ gave less weight to a low GAF score due to the inclusion of trouble related to legal issues in that score. [Tr. 24]. Furthermore, a plaintiff's criminal history, as well as history of substance abuse, may properly be considered as one of many factors in evaluating a plaintiff's credibility. See Netter v. Astrue, 272 F. App'x 54, 55 (2d Cir 2008); see also Waldau v. Astrue, 5:11-CV-925 GLS, 2012 WL 6681262 (N.D.N.Y. Dec. 21, 2012) (explaining that "[plaintiff's] contention that the ALJ erred in considering his criminal history as one of many factors in evaluating his

credibility is without merit"); Arrington v. Astrue, 09-CV-870 A F, 2011 WL 3844172 (W.D.N.Y. Aug. 8, 2011) report and recommendation adopted, 09-CV-870, 2011 WL 3844164 (W.D.N.Y. Aug. 30, 2011). Here, the ALJ relied on several factors in determining plaintiff's credibility, including plaintiff's testimony regarding his activities of daily living and symptoms and the extent to which this testimony was corroborated by the medical records. [Tr. 25]. Thus, the Court would find no error on the record before it even had the ALJ considered plaintiff's criminal history as one factor in her credibility analysis.

Plaintiff's fourth argument, regarding the ALJ's comments about plaintiff's physical appearance during the trial, also fails. Here, while the ALJ commented on plaintiff's appearance during the hearing [tr. 63, 73], she did not even mention such observations in her decision. Furthermore, an ALJ may properly consider her observations of a plaintiff during the hearing as one of several factors in evaluating the plaintiff's credibility, as long as such observations are given only limited weight. See Schaal v. Apfel, 134 F. 3d 496, 502 (2d Cir. 1998).

The Court finds no error in the ALJ's assessment of plaintiff's subjective complaints and credibility and finds that the ALJ's determination is supported by substantial evidence. Plaintiff's disagreements with the ALJ's conclusion do not rise to an error of law.

66

**B.   Mr. Cardona's Opinions**

Plaintiff argues that the ALJ failed to properly give substantial weight to the opinions of Brian Cardona, a licensed social worker who treated plaintiff at InterCommunity Health Center. [Doc. #17-1 at 18-25].

The ALJ is required to assess all medical opinions, including those from non-physicians such as Mr. Cardona, a licensed clinical social worker, and assign some weight to each medical opinion. 20 C.F.R. § 404.1527(c); see also Canales v. Comm'r of Soc. Sec., 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010). In assigning a weight to medical opinions, the ALJ must consider: (1) examining relationship; (2) treatment relationship including length, frequency, nature, and extent of the relationship; (3) supportability; (4) consistency with the record; (5) specialization; and (6) other factors. 20 C.F.R. § 404.1527(c). A treating source's opinion is given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(c)(2). The ALJ has the sole duty to evaluate the medical opinions in the record to determine disability. 20 C.F.R. § 404.1527(d).

The ALJ made the following statements concerning the weight

she gave to Mr. Cardona's opinions:

> In an April 16, 2012 Medical Letter, treating therapist Brian Cardona, LCSW from InterCommunity Mental Health, reported that the claimant continued to suffer from post-traumatic stress disorder (PTSD), which impaired his ability to concentrate. Exhibit 24F. He indicated that the claimant attended weekly group therapy for a period of time but found difficulties in attending group due to problems with attention and staying on task. He explained that the claimant would often wander after about half an hour. He added that the claimant was able to stay focused in individual therapy sessions for 20 minutes. Mr. Cardona also reported that the claimant continues to have difficulties with severe anxiety, stress, depression, irritability, hopelessness, mood swings and panic attacks. He specified that when the claimant's symptoms flare up, he does not process or follow instructions from medical or social service workers. He determined that the claimant continues to have difficulties with listening to supervisors in a work setting when his mood is unstable or he is anxious. He opined that these problems exist even when the claimant has not been drinking or using drugs. The undersigned affords little weight to the findings of Mr. Cardona as they are unsupported by the medical evidence. There are no reports by Dr. [sic] Cardona in the therapy session notes that the claimant had difficulty attending group sessions. In fact, the November 2010 session notes reveal that the claimant was able to keep his appointments and was doing better at regulating his emotions. Exhibit 6F.

> In a Medical Impairment Questionnaire completed on April 16, 2012, Mr. Cardona indicated that the claimant's anxiety and PTSD symptoms were getting worse due to his illness. Exhibit 25F. He identified signs and symptoms including degreased energy, thoughts of suicide, disturbances of mood or affect, generalized persistent anxiety, intense and unstable interpersonal relationships, difficulty thinking or concentrating, illogical thinking and loosening of associations, recurrent and intrusive recollections of a traumatic experience, recurrent obsessions or compulsions, and recurrent and severe panic attacks. He found that the claimant had limited but satisfactory mental abilities and aptitudes needed to do the majority of work related activities of unskilled work. He also determined that the claimant had limited but satisfactory abilities and

aptitudes to maintain socially appropriate behavior and
adhere to basic standards of neatness and cleanliness.
However, contrary to these findings, he went on to assess
the claimant with marked limitations in his activities of
daily living, maintaining social functioning, and
maintaining concentration, persistence or pace. He added
that the claimant had experienced four or more episodes of
decompensation within a 12 month period, each of at least
two weeks duration. He opined that the claimant would be
absent from work more than four days a month. He also
opined that claimant's alcohol and substance abuse did not
contribute to any of the limitations he found. As Mr.
Cardona's assessment is internally inconsistent, the
undersigned affords it little weight. Mr. Cardona initially
determined that although the claimant had noticeable
difficulties, they did not preclude his ability to function
but then went on to rate the claimant with marked
limitation. Furthermore, Mr. Cardona found that the
claimant's psychiatric symptoms were worsening due to his
HIV, which is contrary to Dr. Conte's findings, rendering
Mr. Cardona's opinion less persuasive.

[Tr. 26].

Plaintiff asserts that the ALJ specifically erred by (1)

drawing a negative impression of Mr. Cardona's credibility based

on Exhibit 15E; (2) classifying Exhibit 15E as a nonmedical

source; (3) giving greater weight to some medical opinions than

she did to Mr. Cardona's; (4) substituting her own judgment for

Mr. Cardona's medical determinations; (5) rejecting Mr.

Cardona's statement regarding the effect of substances on

plaintiff's condition; and (6) determining that Mr. Cardona's

opinions were internally inconsistent. [Doc. #17-1 at 18-25].

As to Exhibit 15E, as explained above, the ALJ properly

exercised her fact-finding function in determining what she

believed to be the circumstances of how that document was filled

out. The Court notes that the ALJ did not, as plaintiff asserts, consider Exhibit 15E in deciding what weight to give to Mr. Cardona's opinions. In fact, the ALJ specifically considered this exhibit separately from Mr. Cardona's opinions and medical records. [Tr. 27-28]. Therefore, as Exhibit 15E does not appear to have been part of the ALJ's credibility determination regarding Mr. Cardona, the Court can find no error in this respect. The ALJ also properly exercised her discretion in treating this exhibit as an opinion from a nonmedical source. By plaintiff's own admission, he and his wife filled out at least part of the form. [Tr. 83-84]. The ALJ expressed her concern regarding this exhibit at the hearing and left the record open for two weeks to allow plaintiff's attorney to provide an explanation, stating "I don't want that [Exhibit 15E] to actually be taken as [Mr. Cardona's] opinion because it doesn't seem like it really is. But, you can clarify with him. He can look back at his notes and submit a statement or a new form or something that would maybe explain." [Tr. 85]. The letter submitted by Mr. Cardona specifically states that the "form was filled out by both Anthony Daniel and Brian A. Cardona, LCSW," indicating that at least some of the statements in the form were not Mr. Cardona's. [Tr. 290]. Thus, upon review of the record, the Court cannot find that the ALJ erred in treating this form as a nonmedical opinion. Plaintiff has provided no support, nor

can the Court find any, for the proposition that an entire document must be treated as a medical opinion when it has more than one author, the authors did not fill out the form together, and only one of the authors is a medical source.

As to the ALJ's decision to give some medical opinions greater weight than she gave to Mr. Cardona's opinions, the Court also does not find legal error. The plaintiff first takes issue with the ALJ's decision to assign great weight to Dr. Conte, a treating physician.[25] Plaintiff argues that the ALJ improperly considered Dr. Conte's opinion "that there were no limitations in his activities of daily living or in mental status," stating that "[t]he ALJ did not seem to question the fact that these few words were inconsistent with the fact that Mr. Daniel was treating psychiatrically both <u>before</u> and during Dr. Conte's treatment." [Doc. #17-1 at 19 (emphasis in original)]. While plaintiff's characterization of Dr. Conte's opinion indicates an inconsistency, it is a mischaracterization of the record and the decision. In response to a request to "describe any limitations in activities of daily living and/or changes in mental status," Dr. Conte wrote "none." [Tr. 455]. He

---

[25] Plaintiff does not argue that Dr. Conte is not a treating physician, as the ALJ found, but implies this argument by stating that Dr. Conte "essentially did not see Mr. Daniel after July 2010." [Doc. #17-1 at 19]. Dr. Conte saw plaintiff between February 2010 and September 2010. [See Tr. 319, 511]. Based on the evidence in the record, the Court agrees with the ALJ that Dr. Conte is a treating physician.

did not state, nor did the ALJ find, as plaintiff asserts, that plaintiff had no limitations on his mental status, as he was not asked about this. Although it may be an indicator of such, plaintiff points to no authority for the proposition that seeking or receiving mental health treatment necessitates a medical finding of limitations in activities of daily living or changes in mental status.

Plaintiff also objects to the ALJ's discussion regarding Dr. Lago's opinions [tr. 27], apparently because the ALJ chose to mention some, but not all, of Dr. Lago's findings. [Doc. #17-1 at 20]. An ALJ is not required to mention every piece of evidence or every aspect of every opinion considered. See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012). Plaintiff raises no arguments that amount to legal error. Plaintiff's primary arguments as they relate to the opinions of medical opinions other than Mr. Cardona's appear to be that these other opinions were improperly given greater weight than Mr. Cardona's, which in turn negatively impacted the weight given to Mr. Cardona's opinions. [Doc. #17-1 at 18-25]. As the Court finds no error in the weight given to these medical opinions and further finds that the ALJ's determination regarding these medical opinions is supported by substantial evidence, these arguments fail.

Next, plaintiff argues that the ALJ improperly substituted

her opinion for Mr. Cardona's medical opinion. Interestingly, one example the plaintiff gives is one in which the ALJ agreed with Mr. Cardona, stating that he "correctly assessed the claimant with marked limitation." [Tr. 21]. Plaintiff does not explain how the ALJ's agreement with Mr. Cardona, whose opinion plaintiff is promoting, would be anything more than harmless error, even if she stated such agreement inappropriately. The other example is a statement the ALJ made during the hearing, but which does not appear in her decision, in which the ALJ commented that plaintiff's "counts are now back to a safe range." [Tr. 75]. There is no indication that the ALJ was making a finding of fact when she made this statement. Rather, a review of this portion of the hearing transcript indicates that the ALJ was going through the evidence, summarizing what she saw, and occasionally asking questions to plaintiff's attorney. [See Tr. 74]. The Court finds no legal error in the ALJ's colloquy with the plaintiff and plaintiff's attorney during the hearing.

Plaintiff also argues that the ALJ erred in rejecting Mr. Cardona's statements regarding the effect of substance use on plaintiff's limitations. Plaintiff states that "the ALJ dismisses Mr. Cardona's statement regarding the lack of contribution of substances, even though this is the only direct statement in the whole record which addresses the issue." [Doc. #17-1 at 21]. He further argues that the ALJ cites no evidence

supporting her assertions that plaintiff's condition improves with substance abuse treatment and cessation of substance abuse. [Doc. #17-1 at 21-22]. A review of the ALJ's decision indicates the opposite. The ALJ discussed plaintiff's mental health records at length, specifically noting periods of sobriety and relapses in coordination with fluctuating GAF scores and reported mental and physical changes and abilities. [Tr. 22, 24-25]. Mr. Cardona may have made the most direct statement on this issue, but it is not the only evidence regarding plaintiff's substance abuse in the record. The Court finds that the ALJ's decision is supported by the substantial evidence in the record and that she has set forth her findings with sufficient specificity to permit an intelligent review of those findings.

Finally, plaintiff argues that the ALJ erred in finding that Mr. Cardona's opinions contained internal inconsistencies and thus in giving those opinions little weight. [Doc. #17-1 at 23]. Plaintiff argues that "there is nothing inconsistent between 'not precluding function' and 'marked limitations,'" as the ALJ found regarding Mr. Cardona's opinion of plaintiff's limitations. [Doc. #17-1 at 23]. This is another instance in which plaintiff asks the Court to choose between two rational interpretations of the evidence, which the Court will again decline to do. The ALJ's determination to give little weight to Mr. Cardona's opinion based on what may rationally be

interpreted as internal inconsistencies, lack of evidentiary
support, and conflicts with other medical records [tr. 26] is
supported by the substantial evidence in the record and the
plaintiff's objections do not amount to legal error.

## C.    Materiality of Substance Abuse

Plaintiff argues that the ALJ erred in finding that
substance abuse[26] was material to plaintiff's disability and that
plaintiff's impairments would not preclude employment if
plaintiff ceased the substance abuse. [Doc. #17-1 at 25].

Plaintiff again argues that the ALJ provides no support for
her finding that plaintiff has increased abilities when in
treatment and maintaining sobriety. [Doc. #17-1 at 26]. As
discussed above, the ALJ discusses and cites these records in
detail. [Tr. 22, 24-25]. She cites numerous treatment records
from InterCommunity and the Institute of Living, including a
discussion of how plaintiff's sobriety and treatment impacted
his abilities, as evidenced by the record. [Tr. 22, 24-25].

Plaintiff also argues that the ALJ's findings regarding his
limitations absent substance abuse are insufficient, asserting
that the ALJ simply states that plaintiff is "better," without

_____

26 Plaintiff asserts that "the ALJ emphasized substance
abuse by referring to their use as 'ongoing.' There is no
evidence to support this detail." [Doc. #17-1 at 26]. Plaintiff
provides no citation for this statement and a review of the
ALJ's decision reveals that the ALJ did not refer to plaintiff's
substance use as 'ongoing,' but rather, at times, referred to
plaintiff's "ongoing treatment." [Tr. 20, 22].

addressing his limitations during these periods of no substance use. [Doc. #17-1 at 28]. In determining the materiality of substance abuse in plaintiff's limitations, the ALJ went through her previous findings regarding Listings 12.04 and 12.09 and determined that plaintiff would no longer meet these listings, absent substance abuse, because he would have only moderate difficulties in social functioning and with regard to concentration, persistence or pace, as opposed to marked limitations. [Tr. 22]. These findings are explained in sufficient detail [tr. 22, 24-25] and are supported by the substantial evidence in the record. The ALJ cites to evidence such as plaintiff becoming more active in his church, reporting an improved relationship with his wife, and regulating his emotions better to support these conclusions. [Tr. 22]. This type of evidence, regarding a plaintiff's mental status and activities of daily living in periods of sobriety or treatment, is the type of evidence that the Second Circuit has stated "a reasonable mind might accept as adequate to support [the] conclusion that [a plaintiff's] difficulties with social functioning, and with concentration, persistence and pace, would improve from 'marked' to 'moderate' in the absence of DAA [substance abuse]." Cage v. Comm'r of Soc. Sec., 692 F. 3d 118, 127 (2d Cir. 2012) (evidence considered included positive evaluations during inpatient drug treatment programs, an opinion

that plaintiff's substance abuse made her other conditions worse, plaintiff's admission that her substance abuse was not helpful to her mental issues, and records indicating that plaintiff had used drugs prior to experiencing specific mental problems). The court therefore finds that the ALJ's determination that plaintiff's substance abuse was material to the determination of disability is supported by substantial evidence in the record.

**D.    RFC Analysis**

Finally, plaintiff argues that the ALJ's determination at step five is flawed because the ALJ did not provide the vocational expert with all of plaintiff's limitations and therefore cannot rely on the vocational expert's testimony. [Doc. #17-1 at 34-37]. At step five, the ALJ determined that there was work existing in significant numbers in the national economy that plaintiff could perform. [Tr. 28-29]. Plaintiff's argument rests on his assertion, discussed above, that the ALJ erred in not giving greater weight to Mr. Cardona's opinions. As the Court finds no error there, it similarly can find no error in the ALJ's decision not to provide the vocational expert with hypotheticals encompassing limitations assessed by Mr. Cardona and rejected by the ALJ. Therefore, the Court finds no legal error at step five of the ALJ's decision.

## VIII.    CONCLUSION

District courts have the authority to affirm, reverse, or modify a decision of the Commissioner. 42 U.S.C. § 405(g). For the foregoing reasons, Plaintiff's Motion to Reverse Decision of the Commissioner and/or to Remand to the Commissioner [doc. #17] is DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner [doc. #20 ] is GRANTED. This is a Recommended Ruling. See Fed. R. Civ. P. 72(b)(1). In accordance with the Standing Order of Referral for Appeals of Social Security Administration Decisions dated September 30, 2011, the Clerk is directed to transfer this case to a District Judge for review of the Recommended Ruling and any objections thereto, and acceptance, rejection, or modification of the Recommended Ruling in whole or in part. See Fed. R. Civ. P. 72(b)(3) and D. Conn. Local Rule 72.1(C)(1) for Magistrate Judges.[27]

Dated at Bridgeport, this 6th day of November 2014.


_____/s/_____

HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

---

27 Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of being served with the order. See Fed. R. Civ. P. 72(b)(2). Failure to object within fourteen days may preclude appellate review. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); D. Conn. L. Mag. R. 72.2; F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995); Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989) (per curiam).